UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SIX FLAGS INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-10729** |
| **WESTCHESTER SURPLUS LINES INSURANCE COMPANY et al.** | **SECTION T(3)** |

## ORDER AND REASONS

Before the Court are the following motions: Motion for Partial Summary Judgment filed by Defendant Liberty Corporate Capital ("Liberty"), Rec. Doc. No. 63; and Motion for Partial Summary Judgment filed by Westchester Surplus Lines Insurance Company ("Westchester"), Arch Specialty Insurance Company ("Arch"), Great Lakes Reinsurance (UK) PLC ("Great Lakes"), Commonwealth Insurance Company ("Commonwealth"), Axis Specialty Insurance Company ("Axis"), and Continental Casualty Company ("Continental"). Rec. Doc. No. 66. An Opposition to the Motions was filed by the Plaintiff. Rec. Doc. No. 74. The Motions came for hearing with Oral Argument on July 11, 2007 and were taken under submission. The Court, having considered the arguments of counsel, the parties' briefs, the Court record, applicable law and jurisprudence is fully apprised of the matter and is ready to rule.

**I.   BACKGROUND**

Plaintiff Six Flags, Inc. ("Six Flags") owned and operated an amusement park at 12301

Lake Forest Boulevard in Orleans Parish that was heavily flooded during Hurricane Katrina on or about August 29, 2005.  At the time of the loss, Six Flags had in effect "all-risk first-party property insurance coverage" which covered the period of time during which Hurricane Katrina struck.  Six Flags had multiple layers of insurance, totaling $200 million in aggregate limits of coverage as follows: a primary layer with $25 million in limits, a first excess layer of $50 million, and a second excess layer of $125 million.  Six Flags acknowledges it has received a $25 million lump sum payment representing the primary limit and therefore, has exhausted the available coverage under the primary policy.

When evaluating the excess insurance coverage claims, VeriClaim, Inc.,the adjusting company, indicated that a "Flood Sublimit" would be applied to some of the loss.  *See* Rec. Doc. No. 1 at p. 7.  Six Flags informed the Excess Insurers that it believed that the adjuster's policy interpretation was incorrect and that it had coverage under the excess policies for Named Storm damages such as those caused by Hurricane Katrina.  *See* Rec. Doc. No. 1 at pp.7-8.

This lawsuit ensued on November 30, 2006, seeking declaratory relief and damages for breach of contract against the excess insurers.  Before the Court are two (2) motions for partial summary judgment seeking a declaration that the excess insurers are correct in their interpretation that the Flood Sublimit applies.

## II.     ARGUMENTS OF THE PARTIES

### A.     LIBERTY'S ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT

At the time of Hurricane Katrina, Liberty insured Six Flags for fifty (50) percent of the secondary $125 excess insurance, i.e. that portion of the coverage in excess of the first $75 million.

The policy is a "commercial first-party property policy" that was placed in the London insurance market (hereinafter, "London Policy"). In sum, Liberty's argument is that the Flood Sublimit is applicable to this matter. The applicable Underlying Sublimit, relied upon by Liberty, provides:

>  **Underlying Sublimits**
>  ...
>  Flood at any location within Flood Zone A or V
>  as designated by the Army Corps of Engineers or FEMA,
>  per occurrence and in the annual aggregate
>
>  USD 27,500,000

Rec. Doc. No. 63, Exh. B at LCC 01296.

> Flood is defined in the Policy as:
>
> (1) A general and temporary condition of partial or complete inundation of
> normally dry land areas from:
>    (a) the overflow of inland or tidal waters:
>    (b) the unusual and rapid accumulation or runoff of surface waters from any source: or
>    (c) mudslide or mud flow caused by accumulation of water on or under the ground.
> (2) the release of water impounded by a dam;
> (3) water that backs up or flows from a sewer, drain or sum;

Rec Doc. No. 63, Ex. C at Section 15(C), LCC 01621-LCC 01622.

Liberty submits that this language clearly and unambiguously provides for the applicability of a Flood Sublimit. Liberty argues that its limits applied "per occurrence and in the aggregate for a period in respect of Flood and Earthquake separately" and were "subject to sublimits as defined [in the policy]." Moreover, the "Underlying Sublimits" included "[f]lood at any location within Flood Zone A or V as designated by the Army Corps of Engineers or FEMA, per "occurrence" and in the annual aggregate" for a maximum amount of $27.5 million. Rec. Doc. No. 63-2, p. 4-5.

3

There is no dispute as to the fact that Six Flags' New Orleans amusement park was within Zone A. The London Policy further provides "[f]lood at any location within Flood Zone A or V as designated by the Army Corps of Engineers or FEMA, per occurrence and in the annual aggregate" will be subject to a sublimit without exception for certain types of flood or any combination with other perils. The "Sublimits" section in the policy wording says that sublimits are "applicable to all loss or damage" and that the insurers' "liability . . . shall not exceed" the amount stated. Rec. Doc. No. 63, Exh. C at Section 3(B). Accordingly, Liberty urges these provisions demonstrate that the sublimit is clearly applicable and seeks dismissal of Count I of the Complaint alleging that the Flood Sublimit does not apply.

In support of the Sublimit's application, Liberty relies upon *Altru Health System v. American Protection Insurance Co.*, 238 F.3d 961, 964 (8th Cir. 2001), and *Gilbert/Robinson, Inc. v. Sequoia Insurance Co.,* 655 S.W.2d 581, 584-85 (Mo. Ct. App. 1983). In *Altru Health System*, an insured hospital brought suit against its property insurer, seeking a determination that its coverage for business interruption and extra expense losses, occurring when civil authorities closed its hospital during a flood when the city water supply failed, was not subject to a flood loss sublimit. *Altru Health System*, 238 F.3d at 964. The Eighth Circuit Court of Appeals held that under North Dakota law, the policy clearly and unambiguously limited coverage for all claims arising out of flood, including claims for business interruption losses, and limited the recovery to the sublimit provided for flood losses. *Id.* Similarly, in *Gilbert/Robinson, Inc.,* an action was filed to recover for business interruption losses under an insurance policy. The Missouri Court of Appeal held that business interruption losses were not covered separately and apart from the basic insuring clauses and that the endorsement deleting the exclusion for flood coverage was not ambiguous. *Gilbert/Robinson,*

4

*Inc*, 655 S.W.2d at 584-85. Based upon this jurisprudence, Liberty urges the Court should reject Six Flags' attempt to restrict the application of the sublimits to only certain types of loss or damage, such as a Named Storm.

Additionally, Liberty argues that the following facts are not truly disputed: (1) that Six Flags acknowledges that there is a sublimit for Flood in Zones A or V; (2) that Six Flags does not dispute that Six Flags New Orleans is located within Flood Zone A as designated by FEMA; and (3) that Six Flags does not truly dispute that the normally dry land area at issue was "flooded" on or after August 29, 2005. Therefore, Liberty concludes that the only possible argument Six Flags has to support its theory of recovery is that a Named Storm like Hurricane Katrina is exempt from the application of the Flood Sublimits. Liberty argues in its brief and, reiterated its position at Oral Argument, that Plaintiff's reading of the contract leads to an absurd conclusion because the flood definition and sublimit, are included in the policy's definition of "Named Storm Occurrence." Further, that section determines what constitutes an "occurrence," not what is subject to the sublimit. Accordingly, the provision is not applicable and not at issue.[1]

---

[1]The Liberty policy defines "Named Storm Occurrence" as:

> All loss or damage occurring during a period of 72 consecutive hours which is caused by or results from a storm or weather disturbance which is named by the national Weather Service or any other recognized meteorological authority, or any storm or weather disturbance designated by the Property claims Service-American Insurance Services Group, Inc. as a numbered Catastrophe.
>
> Storm or weather disturbance which is named by the national Weather Service or any other recognized meteorological authority . Storm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including but not limited to Flood, wind, hail, sleet tornadoes, hurricanes or lightning.

Rec. Doc. No. 63, Exhibit C at Section 16.

**B.     ARGUMENTS BY OTHER DEFENDANTS IN SUPPORT OF SUMMARY JUDGMENT**

The remaining defendants separately filed a motion for summary judgment seeking declaration that their respective policies provide for flood sublimits and request the Court grant summary judgment declaring those limits applicable for the same reasons cited by Liberty. Defendants Westchester, Arch, and Great Lakes provide the first layer of excess coverage and their policies provide $50 million in coverage in excess of the $25 million primary layer. This fact is not disputed. *See* Amended and Restated Complaint, ¶ 15, Exh. A. Defendants Commonwealth, Axis, Continental, together with Liberty, are the second layer of excess coverage and their policies, combined, provide the $125 million in secondary excess coverage over the $75 million in coverage provided by the primary policy and first $50 million layer of excess coverage. *See* Amended and Restated Complaint, ¶ 15, Exh. A.

    **(i)     The Westchester, Great Lakes and Arch policies**. **(First Layer Excess)**

These Defendants' policies provide, in pertinent part:

> **3)     LIMITS OF LIABILITY**
>
> ...
>
> B) Sublimits (applicable to all loss or damage):
>
> The liability of this Company resulting from loss or damage insured against herein shall not exceed:
>
> ...
>
> 4) $2,500,000 per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by the Army Corp of Engineers or the Federal Emergency Management Agency (FEMA)
>
> ...
>
> **16)     EARTHQUAKE, FLOOD AND WINDSTORM**
>
> ...
>
> C) Flood is defined as:

> 1) A general and temporary condition of partial or complete inundation of normally dry land areas from:
>
> (a) the overflow of inland or tidal waters;
>
> (b) the unusual and rapid accumulation or runoff of surface waters from any source;
>
> ...
>
> Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from flood, except loss or damage from resulting Fire, Explosion and Sprinkler Leakage or loss or damage otherwise excluded by this policy.

Rec. Doc. No. 66, Exh. B-G.

### (ii) The Commonwealth, Continental and Axis policies. (Second Layer Excess excluding Liberty)

These Continental and Axis policies provide, in pertinent part:

### 3) LIMITS OF LIABILITY

> ...
>
> C) Underlying Sublimits:
>
> ...
>
> 3) $27,500,000 per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by the Army Corp of Engineers or the Federal Emergency Management Agency (FEMA).

Rec. Doc. No. 66, Exhibits B-G.

The Continental and Axis Policies define "flood" as

> C) Flood is defined as:
>
> 1) A general and temporary condition of partial or complete inundation of normally dry land areas from:
>
> (a) the overflow of inland or tidal waters;
>
> (b) the unusual and rapid accumulation or runoff of surface waters from any source;
>
> ...
>
> Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from

>>flood, except loss or damage from resulting Fire, Explosion and Sprinkler Leakage or loss or damage otherwise excluded by this policy.

Rec. Doc. No. 66, Exhibits B-G

>The Commonwealth policy defines "flood" in Endorsement 7 to the policy as:

>>C) Flood: The term "flood" is defined as loss or damage caused by waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. Loss resulting from, contributed to or aggravated by a "flood" caused by a peril not otherwise excluded under this policy shall not be considered in application of the policy "flood" limit or deductible provisions.

>>Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from flood, except loss or damage from resulting Fire, Explosion and Sprinkler Leakage or loss or damage otherwise excluded by this policy.

Rec. Doc. No. 66, Exhibit E-2 at p. 31.

Similar to Liberty, these defendants argue that the words in their respective contracts are clear and unambiguous; therefore, should be given effect as written and the sublimit should apply. Second, these defendants urge that the purpose of such sublimits is to "limit the insured's ability to the amount explicitly stated in the sublimit provision." Rec. Doc. 66 at p. 8. Here, the Flood Sublimit, they argue, applies as "respects Flood at any location in a Flood Zone A or V." Because it is undisputed that the property at issue was in Flood Zone A and was damaged by Flood, the sublimit is applicable.

In support, defendants rely upon the *Altru Health System* and *Gilbert/Robinson, Inc*. cases cited *supra*, as well as two (2) other cases. The first is the *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp.2d 260, 263 (D. Mass. 2004) case. In that case the Massachusetts District Court held that a $500 sublimit for damages to and removal of any tree, plant or shrub in a property insurance policy providing general coverage up to $300,000 for "direct physical loss or

8

damage to golf course grounds" was clear and unambiguous and applied to an insured's claim for damaged trees notwithstanding the insured's argument that the loss of the tree was accompanied by additional losses to the surrounding area. These defendants also rely upon *Indiana Ins. Co. v. Para Cmty. Unit Sch. Dist. No. 8*, 173 F. Supp.2d 835, 841 (C.D. Ill. 2001), aff'd, 314 F.3d 895 (7th Cir. 2002) where the United States Seventh Circuit Court of Appeals held that a "0" replacement value for a listed building was an unambiguous sublimit and enforced the sublimit for the specified location notwithstanding the insured's argument that a policy providing blanket coverage but then assigning "0"dollars for the building's replacement value rendered the policy ambiguous.

Finally, defendants rebut plaintiff's argument that the "Weather Cat Occurrence" provision renders the flood sublimit inapplicable to losses from Hurricane Katrina. Defendants urge that because the "Weather Cat Occurrence" groups certain loss or damage associated with named storms into "one occurrence" when such loss occurs within 72 hours. According to defendants' interpretation of the policy, this clause groups all named storm-related loss or damage into one "occurrence" and it does not affect the scope or application of the Flood Sublimit. Inasmuch as this clause is interrelated with and dependant upon other policy provisions, defendants urge that the "Weather Cat Occurrence" is not self-contained and is within the reach of the Flood Sublimit.. Rec. Doc. No. 66 at p. 11.[2]

### C.     PLAINTIFF'S OPPOSITION

Plaintiff first argues that the defendants interpretation is inaccurate. Determining whether Hurricane Katrina damages arose from wind, water, wind-driven water, storm surge or flood waters

---

[2]The full text of the "Weather Cat Occurrence" is provided in Section III, C *infra*.

9

is irrelevant to the coverage defendants sold Six Flags because Six Flags paid $5,716,927 to purchase "all risks" commercial property insurance for its theme parks that provide up to $450 million in limits for all damage resulting from a Named Storm –e.g., a hurricane. Of that $450 million in coverage, the Defendants insured Six Flags for losses from $25 million to $200 million, receiving premiums of $699,232 of the $5,716,927 total premiums. Six Flags argues that "unlike the many tragic Katrina cases now winding their way through the courts, Six Flags' commercial property insurance program includes relatively rare and valuable terms of coverage protecting it from 'the peril of a Named Storm, including, but not limited to Flood, wind, hail, sleet, tornadoes, hurricane or lightning.'" Rec Doc. No. 74, p. 7 citing, e.g. WACAC Exh. B at § 5(H), § 17. The crux of the Plaintiff's arguments is that the Defendants chose in their policies to recognize a Named Storm peril, to set a deductible for said peril, and to separately define the peril to include all what can happen when a Named Storm hits. Defendants chose not to set a Named Storm sublimit, which they could have done and, in fact, did do by providing a Named Windstorm sublimit. *Id.*

Accordingly, it is the Plaintiff's position that the policies expressly provide that all losses or damages resulting from a Named Storm would be fully covered. In support, it relies upon the "Weather Cat Occurrence" provision cited *infra* for the proposition that "*all* loss or damage" would be covered. Plaintiff acknowledges that there are three (3)covered perils in the policy: Earthquake, Flood and Named Storm. Plaintiff avers that under the terms of the policies, the losses caused by the three recognized perils are adjusted as such, with the respective deductible and limits or sublimits, if any, applied to the loss. Thus, because there are no separate limits for losses resulting from a Named Storm, Plaintiff's losses from Hurricane Katrina are covered up to the total limits of the policies.

Plaintiffs also rely on the Primary Policy Deductible for each peril. The pertinent part of the policy provides:

> **5)** **PRIMARY POLICY DEDUCTIBLES**
> All losses, damages or expenses arising out of any one occurrence shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted:
>
> ...
>
> B) 5%... for the peril of Earthquake
>
> ...
>
> E) 5%... for the peril of Flood
>
> ...
>
> H) 3%... for the peril of a Named Storm.

Rec. Doc. No. 74 at p. 13, citing WACAC Exh. B, § 5, pp. 4-5.

In further support for its contention, Plaintiff argues that the policies set forth "Underlying Sublimits" specifically for Earthquake and Flood in Flood Zone A or V, but does *not* specify any limit on coverage for a loss resulting from "Named Storm" other than the total limits of the policy itself.

> **3)** **LIMITS OF LIABILITY**
> A) This Company shall not be liable for more than its proportion of the following limits for any one occurrence applicable separately to each limit…
>  2) With respect to the perils of flood and earthquake, this company shall not be liable, per occurrence and in the annual aggregate, for more than its proportion of $125,000,000 which shall apply separately to each peril as referred to in Section 16.
> B) Sublimits (applicable to all loss or damage)…
>
> C) Underlying Sublimits:…

    3)  $27,500,000 per occurrence and in the term
       aggregate asrespects Flood at any location in
       a Flood Zone A or V…

Rec. Doc. No. 74, p. 14 citing WACAC Exh. B.

Second, Plaintiff avers that if the Court is not convinced that the policies unambiguously cover all losses from a Named Storm, that the policies are ambiguous and should be construed against the insurers. Plaintiff contends that the contract language was drafted by Industrial Risk Insurers ("IRI"), the lead primary insurer, not the Plaintiff, and that this language then became the base policy language for the excess policies which copied IRI's provision into each of their policies. Plaintiff submits a list of extrinsic evidence that it claims indicates that IRI was the drafter of the policy language. It also provides a list of other documents meant to evidence the defendants' intent to provide full coverage for loss or damage related to a named storm.

Finally, Plaintiff argues that if the provisions of the insurance contracts are susceptible to two (2) or more reasonable interpretations, the provisions are ambiguous. Because ambiguities are construed against the insurer, Plaintiff argues it should prevail. Rec. Doc. No. 74 at pp. 15-18. Alternatively, Plaintiff urges that the Court examine the extrinsic evidence Six Flags submitted to determine the intent of the parties. That evidence demonstrates alternate reasonable interpretations of the policy language and therefore, renders the policy ambiguous. Rec. Doc. No. 74 at pp. 18-20. Again, this ambiguity, Plaintiff urges, should also be construed against the defendants because they furnished the text of the policies.

### III. LAW AND ANALYSIS

#### A. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record

discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  A fact is material if it "might affect the outcome of the suit under governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio.*, 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  *See Id.*  Therefore," [i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id*. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  *Id.*  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the court must read the facts in the light most favorable to the non-moving party.  *Anderson,* 477 U.S. at 255.

The only matter disputed in both these motions is the interpretation of the Flood Sublimit contained in the respective policies.  As the issue here deals with the construction of an insurance policy, a legal question, the matter is ripe for summary judgment.  *See Principal Health Care of*

13

*La.,m Inc. v. Lewer Agency, Inc*., 38 F. 3d 240, 243 (5th Cir. 1994).

## B.    INSURANCE CONTRACT INTERPRETATION

In diversity cases such as this one, it is well settled that federal courts must apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 265 (5th Cir.1997). Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La.2003). The Louisiana Civil Code plainly provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." LSA-CC art. 2045; *See also Cadwallader,* 848 So.2d at 580; *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La.1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." LSA-R.S. § 22:654. Interpretation of an insurance contract generally involves a question of law. *Bonin v. Westport Ins. Corp.,* 930 So.2d 906, 910 (La.2006) *citing Robinson v. Heard*, 809 So.2d 943, 945 (La.2002); *See also La. Ins. Guar. Assoc*., 630 So.2d at 764.

Further, "[t]he words of a contract must be given their generally prevailing meaning." LSA-CC art. 2047. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LSA-CC art. 2046. "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader*, 848 So.2d at 580. Any "[a]mbiguity ... must be resolved by construing the policy as a whole; one policy provision is not to be construed

separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n,* 630 So.2d at 763. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. LSA-CC art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. *Id.* If the policy is susceptible to two or more interpretations, and each of the alternative interpretations is reasonable, then there is an ambiguity which must be construed against the drafter. *Cadwaller,* 848 So. 2d at 580. The fact that a term is not defined in the policy itself does not alone make that term ambiguous. *Am. Deposit Ins. Co. v. Myles,* 783 So.2d 1282, 1287 (La.2001).

If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, in the insurance context, in favor of the insured. *La. Ins. Guar. Ass'n*, 630 So.2d at 764. *See also* LSA-CC art. 2056. Equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. *Cadwallader*, 848 So.2d at 580.

### C. ANALYSIS

"When the words of a contract are clear and explicit and lead to no absurd consequences, **no further interpretation may be made** in search of the parties' intent." LSA-CC art. 2046 (1987)(emphasis added). Therefore, if no ambiguity exists, "the insurance contract must be enforced as written." *Cadwallader,* 848 So.2d at 580. The Court interprets the policy "by construing [it] as a whole; one policy provision [will not be] be construed separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n*, 630 So.2d at 763 *citing* LSA-CC art. 2050 (1987).

15

The policies at issue, while organized slightly differently, each contains a clear defintion of Flood and provide as the follows:

> **Flood:** The term "flood" is defined as loss or damage caused by waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. Loss resulting from, contributed to or aggravated by a "flood" caused by a peril not otherwise excluded under this policy shall not be considered in application of the policy "flood" limit or deductible provisions.
>
> Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from flood, except loss or damage from resulting Fire, Explosion and Sprinkler Leakage or loss or damage otherwise excluded by this policy.

The first portion of this definition explains what Flood includes: waves, tidal water, overflow, etc.  The second paragraph of the definition explains that Flood includes **all loss or damage resulting from flood**, and makes only very limited exceptions to this definition, such as Fire, Explosion or Sprinkler Leakage.  Nowhere in the term Flood or its exceptions is a Named Storm or waters resulting from a Named Storm specifically excluded.

Furthermore, the term Flood is <u>specifically included</u> in the definition of "Weather Cat Occurrence."

> 17) WEATHER CAT OCCURRENCE All loss or damage occurring during a period of 72 consecutive hours which is caused by or results from a storm or weather disturbance which is named by the National Weather Service or any other recognized meteorological authority. Storm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including, **but not limited to Flood**, wind, hail, sleet, tornadoes, hurricane or lightning.

Rec. Doc. No. 66, Exhibits B-G.

This provision is clear.  It lumps all losses or damages occurring within a 72-hour period of

16

time into one covered loss for adjustment purposes.  This would aptly apply in the situation of a Named Storm because the damages created during such a disaster do not occur simultaneously or because of one particular natural evil, but a combination of perils, such as Flood, wind, hail, sleet etc, over a period of many hours or even days.  The term Flood in this provision recognizes that the damages created by water during a Weather Cat Occurrence are only a part of a larger scheme of damages created possibly by Flood, but also by other perils that all contribute to the damages one incurs when a weather disturbance serious enough to be named by the National Weather Service occurs.

Finally, the Flood Sublimits are unambiguous.  All the sublimits are virtually the same or identical in language to the following two examples:

> 4) **$2,500,000** per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by the Army Corp of Engineers or the Federal Emergency Management Agency (FEMA)

Rec. Doc. No. 66, Exh. B-G (emphasis added).

> 3) $**27,500,000** per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by the Army Corp of Engineers or the Federal Emergency Management Agency (FEMA).

*Id.* (emphasis added).

These sublimits specifically limit recovery for Flood in Zone A or V to its respective dollar value **per occurrence**.  The Weather Cat Occurrence provision defines what that "occurrence" is.  Therefore, any Flood created during the 72-hour period of time that created the Plaintiff's damages due to the Named Storm would be adjusted as one occurrence, and be subject to one deductible, but also to the one clearly defined sublimit.  This interpretation best represents the meaning and context of the contract as a whole by applying the definition of Flood and applicability of the sublimit

consistently throughout the policy.

Accordingly, the Court finds that the insurance contracts at hand are clear, unambiguous and not subject to two (2) reasonable interpretations. The Court declines to delve into extrinsic evidence presented for the purpose of determining who drafted the policies, or the intent behind different language or provisions. To do so would be in clear error as no further interpretation may be made where the Court finds the text of the policy to be clear. In light of the findings made herein, the Court also **DENIES** as **MOOT** Six Flags' Motion to Supplement its Opposition to the Motions for Partial Summary Judgment requesting the Court consider additional extrinsic evidence.

Accordingly and for the reasons stated herein,

**IT IS ORDERED** that the Motion for Partial Summary Judgment filed Liberty Corporate Capital, LTD, Rec. Doc. 63, is **GRANTED**.

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment filed by Arch Speciality Insurance Company, Axis Speciality Insurance Company, Commonwealth Insurance Company, Continental Casualty Insurance Company, Great Lakes Reinsurance (UK) PLC, and Westchester Surplus Lines Insurance Company, Rec. Doc. 66, is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Supplement the Record in Opposition to Defendants' Motions for Summary Judgment, Rec. Doc. 114, is **DENIED AS MOOT**.

New Orleans, Louisiana, this 1st day of February, 2008.

_____
**UNITED STATES DISTRICT JUDGE
G. THOMAS PORTEOUS, JR.**